Filed 6/15/21  P. v. Williams CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090223 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F04470) |
| v. | |
| MICHAEL WILLIAMS, | |
| Defendant and Appellant. | |

This is a homicide case that returns to us following retrial.  In July 2014, defendant Michael Williams stabbed his wife, victim Tanganyika Hoover Williams, in the neck with a box cutter, and she bled to death.  The first trial resulted in a first degree murder conviction with a finding that defendant personally used a deadly weapon in the commission of the killing.  (*People v. Williams* (2018) 23 Cal.App.5th 396.)  In defendant's first appeal, we concluded that the trial court erred in permitting the People to introduce evidence of defendant's then 23-year-old conviction (out of Oklahoma) for shooting with intent to kill and the circumstances thereof.  (*Ibid.*)  However, because

1

sufficient evidence (apart from the prior acts evidence) was presented to support the first degree murder conviction, we remanded the matter for retrial.  (*Ibid*.)

Following retrial, the jury again found defendant guilty as charged.  (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1).)[1]  The jury then found defendant sane, and the trial court found he had a prior serious felony conviction and prior strike (the 1992 Oklahoma conviction).  (§§ 667, subds. (a), (b)-(i), 1170.12.)  The court sentenced him to an aggregate term of 56 years to life in prison.  This timely appeal followed.

Defendant now contends reversal is required due to instructional error, ineffective assistance of counsel, and insufficient evidence.  Further, the parties agree that the abstract of judgment contains errors that must be corrected.  We will affirm the judgment and direct the trial court to prepare a corrected abstract of judgment.

## BACKGROUND

There was no dispute in either trial that defendant killed the victim on the morning of July 8, 2014.  The issues were defendant's state of mind and his sanity at the time of the killing.  The defense theory was that defendant was guilty of voluntary manslaughter based on heat of passion arising from provocation and was not legally sane at the time he killed the victim.  Because defendant has not raised any claim of error related to the sanity phase of the trial, we do not discuss that phase here.

A. *People's Case*

In July 2014, defendant and the victim had been married for less than a year, but they had been together for two or three years.  During their relationship, the victim stayed in several places, including with family members, defendant's van, or a motel.  The victim received Supplemental Security Income (SSI) and used drugs, including methamphetamine.

---

[1]  Undesignated statutory references are to the Penal Code.

2

On July 6, 2014, the victim's son helped her move her things out of a motel.  She told him that she was having problems with defendant.  Later that day, she met with defendant to try to work things out between them.  The next day, she told her son that she had decided to leave defendant and obtain a divorce.

On the morning of July 8, 2014, several witnesses saw the victim lying on the ground bleeding.  She was naked from the waist down, had a puncture wound to her neck, and was covered in blood.  When the witnesses asked the victim who had done this to her, she said defendant's name or that her husband or boyfriend did it.  The victim told one of the witnesses, a police officer, that she had been stabbed with a "writing pen."  Another witness testified that when he returned home from work between 6:00 and 6:35 a.m., he saw a man and a woman near a car that was parked in front of a greenish-blue van;[2] the woman was dancing to music.  Around 8:00 a.m., the witness woke up to the sound of his dogs barking, heard screaming, and found the victim on the sidewalk near his driveway.  The van was gone.

The victim had a potentially lethal amount of methamphetamine in her system, but that did not kill her.  Her death was caused by two stab wounds to the neck, which were inflicted by a "sharp edged instrument," like a knife or "a very thin object with a blade."  There was a defensive cut on the victim's left thumb and fresh blunt force injuries on her head, neck, torso, and extremities.  The first stab wound was 4.1 centimeters (i.e., 1.6 inches) deep.  The depth of the second stab wound, which pierced the victim's thyroid gland and was the lethal wound, could not be determined because the object used in the stabbing entered her windpipe.

The victim's car was parked at the scene.  There was a pile of personal items, including clothing, on the ground next to the car.  Blood was on the pile and on the

---

[2] Defendant drove a green Chevrolet Astro Van.

ground around it. Her purse was found in defendant's van, which was parked about a mile away from the scene. Methamphetamine pipes and four knives were also found in the van. Blood was on the inside and outside of the van. The blood patterns were consistent with a person being stabbed inside the van and then getting out of the rear cargo door. The DNA profiles from the blood samples taken from the van matched the blood taken from the victim during her autopsy.

Prior to the victim's death, defendant left several voice messages for her that were discovered after her death. In one of the messages, he asked, "Why you take all the stuff out?," and told her that he loved her and apologized to her. Several hours later, he left another message apologizing to the victim and promising that he loved her.

When defendant was arrested several weeks later on July 29, 2014, he initially gave the officer a false name. A search of the backpack he was carrying revealed a Greyhound bus itinerary for Oklahoma City departing from Sacramento on August 1, 2014. During a police interrogation later that same day, which was recorded and played for the jury, defendant falsely asserted that the last time he saw the victim was a month earlier, in a Sears parking lot.

In another recorded conversation played for the jury (from jail in September 2014), defendant told a friend (Gwen Nance) that he was going to "beat" the case, explaining that he would probably have a dual trial in which the jury would have to determine whether he was sane at the time of the killing. He said that he and the victim were "both so smoked out" he "couldn't tell . . . if we was coming or going," and that his defense was going to be that the victim tried to kill herself while "we was both smoked out." He said he was convinced the victim was going to leave him after she received all of her SSI checks, the last of which she received shortly before her death. He said he should have immediately went home to Oklahoma after the killing, that he had been preparing to go to Texas, and that he might be facing the death penalty because of the

4

"real heinous" nature of the "crime." He noted that he had shaved his head, his face, and even his eyebrows to avoid detection.

As part of the People's case-in-chief, they presented most of defendant's testimony from the first trial, which was read to the jury. We discuss this testimony in greater detail *post* only as necessary to highlight inconsistencies between defendant's testimony at his first and second trials.

B. *Defense Case*

Defendant testified on his own behalf at the retrial as well. He explained that in 2014 he was taking psychiatric medications about twice a week to treat symptoms caused by schizophrenia and bipolar disorder (e.g., voices and hallucinations). However, he stopped taking his medications in mid-June 2014 and did not take them at any point thereafter before the killing because he was using methamphetamine. On the days he did not take his medications, he could not think clearly (i.e., "no train of thought") and would get panic attacks, which would make him scared of everything, including the victim, to the point where he thought he was going to be killed. He also heard voices and had mood swings when he was not taking his medications, which made him angry and created conflict in his relationship, leading to arguments with the victim. He smoked methamphetamine several days a week or more, depending on how much money he had. He would not take his medications on those days.

From July 1 to July 8, 2014, defendant continuously smoked methamphetamine and did not sleep much. On the evening of July 7, 2014, he was paranoid about everything and heard "demonic voices." In the early morning hours of July 8, 2014, he left several voice messages for the victim and was wondering whether they were going to stay together. Around 3:45 a.m., the victim met up with him at his van and they smoked "[a] lot" of methamphetamine. She left around 30 to 60 minutes later to go to her daughter's house. At that point, he was having "happy thoughts" and thinking they were going to stay together.

When the victim returned to the van later that morning, she hugged defendant and danced to music in the street for about 30 minutes. At that point, they got into the front seats of the van, smoked methamphetamine for about 30 minutes, and then went into the cargo area of the van and talked. During that conversation, he asked her whether she was going to leave him. He became angry when she refused to answer and smirked. After she refused to answer the same question several more times, he grabbed her shoulder and started shaking her. As he was doing so, she continued to smirk but said nothing. He picked up a box cutter off the floor and held it against her throat. He heard a voice say "[g]et her." He continued to ask her if she was going to leave him, but she did not respond. He was very angry, an eight on a scale of one to 10, and "wasn't thinking at all"; he just wanted her to tell him they were going to stay together. At that point, a struggle ensued; they began wrestling and rolling around the van. He did not want to kill her and did not intentionally cut her. He did not know how she got cut but indicated that she must have been cut while they were wrestling and rolling around. When he noticed blood, he let go of her shoulder. He tried to stop her from leaving the van but gave up once she opened the rear sliding door. He fled the area to avoid arrest. He abandoned the van in a parking lot and threw the box cutter away. He did not call 911.

At his first trial, on cross-examination defendant had admitted that he stabbed the victim twice in the neck. He had explained that he held the box cutter to her neck while he was asking her whether she was going to leave him and who she was leaving him for. After she smirked, he stabbed her in the throat, which caused her to bleed "a lot." She tried to get out of the van, but he stopped her. She told him that she wanted to go to a doctor, but he ignored her. He put the box cutter to her throat, and she was cut a second time—though he did not remember how that happened—and then her thumb was cut while she was fighting for her life. At that point, there was "blood going everywhere" and the victim was able to get out of the van and yell for help. He drove off "to hide and get away."

Also at his first trial, when confronted by the prosecutor with evidence of his jail conversation with Nance, defendant admitted telling her that he was going to beat the case, via a strategy of saying he was mentally ill and too high to know what he was doing, but testified that was a truthful statement about his condition.  Defendant first claimed he did not know the victim was going to leave him when she smirked, but under continued cross-examination he admitted that he knew she was going to leave him and that he had worried about her leaving for months.  He wanted a firm answer from her in the van, and responded to the prosecutor:

"Q.  And she said no?

"A.  No, she didn't.

"Q.  And she smirked at you?

"A.  Yes, she did.

"Q.  *And you killed her for it*?

"A.  *Yes, I did*." (Italics added.)

Later, defendant again contradicted himself and denied that he had been worried for months about the victim leaving him.  But he admitted that in the months leading to the killing, he had told his social worker several times he was worried about the victim cheating on him.  He also admitted that on July 6, 2014, he and the victim were not getting along, and that she took back some clothes she had bought for him and approximately $700 she had given him.  He also admitted that she was not returning his phone calls and agreed that he was losing control of her.

On redirect at his first trial, defendant testified as follows:

"Q.  Now, you said yesterday on cross, after you stabbed her the first time, she tried to get up and get out of the van?

"A.  Correct. [¶] . . . [¶]

"Q.  And you grabbed her and [kept] her from leaving, correct?

"A.  Correct.

"Q. And you sat her back down, correct?

"A. That's correct.

"Q. *And you put the knife back to her throat, correct*?

"A. *Correct.*

"Q. *And you stabbed her again to get the job done, right*?

"A. *Correct.*

"Q. She wasn't dead yet, right?

"A. No, she wasn't.

"Q. *And when she fought back, she put her hand up to try to block you from stabbing her again, correct*?

"A. *I believe so.*

"Q. *And that's when you cut her hand and almost cut her thumb off, right*?

"A. *Yes.*" (Italics added.)

On cross-examination at his retrial, defendant acknowledged that his testimony on direct examination differed from the testimony he gave in the first trial. He claimed that his memory was better during the second trial.

Upon further questioning from the prosecutor, defendant admitted that he remembered stabbing the victim in the neck two times and cutting her thumb. Consistent with his testimony in the first trial, he admitted that, after he stabbed the victim the first time, he stopped her from leaving the van, put the box cutter to her neck, stabbed her a second time to "get the job done" and "finish her off," and then almost cut her thumb off when she fought back and blocked him from stabbing her a third time. Although he said that he did what the voices told him to do, he admitted that he killed the victim because of the smirk on her face. He also admitted that he changed his appearance (e.g., shaved his head) after stabbing the victim to avoid arrest.

Dr. Jason Roof, medical director for jail psychiatric services at the Sacramento County jail, testified as an expert witness concerning schizoaffective disorder,

8

schizophrenia, bipolar disorder, psychotropic medications and their effects, and the effects of methamphetamine on a person's brain and thinking process. He explained that people with schizoaffective disorder suffer from schizophrenia as well as a separate mood component, such as a manic or depressive episode. He further explained that persons suffering from schizophrenia have symptoms that include seeing or hearing things, hallucinations,[3] delusional thought processes, disorganized behavior or speech, paranoia, and failing to express much, or any, emotion. He also explained that methamphetamine use can affect a person's perceptions and cause short-term and long-term psychotic symptoms, including hallucinations and delusions. Methamphetamine use can also negatively impact memory, and cause paranoia, anger, agitation, and aggression. When asked, Dr. Roof said that goal-directed behavior could potentially indicate that a person was not experiencing symptoms of a schizoaffective disorder or a methamphetamine-induced psychosis. However, he also said that a person experiencing psychotic symptoms can engage in goal-oriented behavior.

Although he had never met defendant, Dr. Roof reviewed his psychiatric records and the testimony given by Dr. Gregory Sokolov at the first trial. Dr. Roof testified that defendant had been diagnosed with schizoaffective disorder, with either bipolar or major depressive disorder. His symptoms included paranoid delusions, irritability, mood swings, racing thoughts (meaning disorganized, panicky thinking where the person finds it very difficult to maintain a train of thought), depression, auditory hallucinations, panic attacks, and paranoia. He took several medications to treat his symptoms. Dr. Roof explained that stopping the medications can lead to the recurrence of symptoms within a week to 10 days, although some symptoms could return up to a month later. Dr. Roof

---

[3] Dr. Roof described hallucinations as experiencing a sensory "thing" with one of the five senses that appears real but is not. For instance, a person may hear or see something that no one else can hear or see.

also explained that taking the medications sporadically would decrease their effectiveness; for example, taking Depakote only two days a week would have the same effect as not taking it at all.

Allen Lee, defendant's former social worker at the mental health clinic, testified that he met with defendant on July 2, 2014. At that time, defendant did not report any suicidal or homicidal thoughts and said that he had been taking his medications. He did not report any auditory or visual hallucinations and mentioned that his relationship with the victim could be very stressful at times. In a telephone conversation on May 28, 2014, defendant told Lee that he was taking his medications, not getting along with the victim, and wanted a divorce but did not know what to do. About a week earlier, defendant told Lee that he thought the victim was cheating on him and he wanted a divorce. When asked, Lee said that defendant's symptoms included auditory and visual hallucinations, delusional thinking, panic attacks, anxiety, irritability, mood swings, racing thoughts, difficulty sleeping, and depression.

Monte Chavez, defendant's friend, testified that there was nothing unusual about defendant's demeanor on the night before the killing. Chavez knew the victim and defendant were having relationship problems, but defendant did not mention any such problems.

## DISCUSSION

### I

### *Alleged Instructional Errors*

Defendant has raised a number of instructional errors he argues require reversal. We address each claim in turn below. As we shall explain, we find no reversible error.

A. *Standard of Review*

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context

with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) In making this assessment, we presume the jurors understood and followed the trial court's instructions. (*Ibid.*)

B. *Beyond a Reasonable Doubt Standard*

Defendant first contends the trial court improperly instructed the jury on the concept of proof beyond a reasonable doubt when it made comments to the jury about the concept of reasonable doubt. Specifically, defendant claims error in characterizing "abiding conviction" (as used in CALCRIM No. 220) to mean a "firm belief"; equating proof beyond a reasonable doubt to everyday decision-making; and telling prospective jurors that they would not be "judging" defendant.

Although we certainly do not condone the court's use of imprecise language in discussing the fine points of pattern instructions with the jury, we see no prejudicial error. Because we reach the merits of this issue, we do not consider forfeiture.

1. *Additional Background*

When initially explaining the concept of proof beyond a reasonable doubt to prospective jurors during jury selection, the trial court made a number of apparently unscripted comments to the jury. We elaborate and italicize the portions at issue here:

"Only the district attorney has the burden of proof in the guilt phase. If we get to the sanity phase, then the defendant will have to put on evidence if we get there. Because he would have the burden of proof. At this stage, the [district attorney's] burden of proof in the guilt phase is beyond a reasonable doubt.

"Now, what does that mean? You're going to be hearing that phrase 'beyond a reasonable doubt' throughout the trial. What does that mean? That's the standard that the district attorney has to meet. Right?

"Here's the way it's been defined. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. Abiding conviction.

11

" '*Abiding' meaning a firm -- well, meaning a belief that is not temporary, not transitory. It is something that if you think about it six months from now or a year from now, you would still feel the same way. An abiding conviction that it is not just temporary. 'Conviction' meaning a firm belief.* Basically that's how it's been defined.

"Folks, it goes on to say the following. The evidence does not have to eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

"So the burden of proof is not proof beyond all doubt, or like some of those old movies where they talk about proof beyond the shadow of a doubt, that's not the burden. It's burden of proof beyond a reasonable doubt. That's the district attorney's burden.

"As I said a moment ago, until the jury, after deliberating after they hear all the evidence, they hear all the argument and I give you the law that applies to the charge of murder, I'll define murder for you and some other things that relate to it, until the jury after deliberating, agrees that the district attorney has met that burden, remember, he's still presumed innocent and you have to vote not guilty. Unless you agree the [district attorney] met his burden. All right." (Italics added.)

Shortly thereafter, the trial court made the following additional remarks:

"One last point. Ladies and gentlemen, occasionally I will get a juror or prospective juror, I should say, that tells me that they're unable to serve on a jury because they don't believe it is their place or their role to judge people. You know, I get that occasionally.

"Whenever I get that, normally it's somebody coming at me from some kind of moral or religious belief that they live their life by. They don't feel they should -- it's not their role to judge people. And you know, they tell me, 'Judge, I can't serve on the jury, I can't do this.'

"Now, do any of you have that kind of thought? Anybody have that kind of thought?

"Yeah, tell me your name, sir.

[¶] . . . [¶]

"The COURT: Anybody else entertain that thought?

"Let me throw something at you here, something I think could be helpful in terms of deciding whether or not that's a problem.

"Ladies and gentlemen, as a juror, by the way, *you are not judging the defendant*. You are deciding whether or not you are convinced by the evidence presented to you in the courtroom. [Did] the district attorney . . . meet his 'beyond a reasonable doubt' standard.

"You are weighing the evidence. You're assessing whether or not you are convinced by what you're hearing. Okay. One way or the other. So *you're not judging the defendant*. Okay.

"And so I like to analogize it to the fact that *as a juror, you are not doing anything different than things that we all do every day. By that I mean, every day there's people talking to us, telling us things. At work, at home. You know, did you know this? I heard that. I saw this. And we're listening, and you're deciding, determining whether or not how much of what we're being told we're willing to trust as being true and accurate.*

"*As a juror, you're doing the very same thing.* How much of what I'm hearing am I willing to believe as being true and correct.

Now this being a criminal trial, we have this 'beyond a reasonable doubt' standard, but it's the same basic exercise: . . . [D]o I believe this? All right.

"*In that regard, we do that every day when people are talking to us. At home, work, go to a store, talking to a salesperson, they're telling you something, you're deciding whether or not you're willing to trust that person.*

"*It's no different. We have this beyond a reasonable doubt thing, but it's the same exercise, same function. You're doing the same thing.*

"If, after the jury deliberates, let's say they come back and they find the defendant guilty. All right. Well, ladies and gentlemen, at that point I decide what happens to the

defendant, not you.

"Punishment, by the way, if any needs to be meted out, is my job, it's not the jury's role.  Okay.  So *you're not judging the defendant*, you're deciding whether or not you are convinced by the evidence and whether or not the standard of beyond a reasonable doubt has been met.

"So I hope that that clears up that thought, if any of you had entertained that notion.  Because, you know, *you're not judging the defendant*.  As a matter of fact, you'll be hearing from me, and maybe the lawyers too, possibly, you're going to be hearing us tell you that you are specifically not to consider punishment in deciding any issue in the case because that is not the jury's province, that is my role if he is in fact convicted of something.  All right."  (Italics added.)

Following the presentation of evidence and before closing arguments, the trial court orally instructed the jury on the presumption of innocence and reasonable doubt standard pursuant to the pattern instruction, CALCRIM No. 220.  Prior to deliberations, the jury was provided a written copy of the final instructions, which included CALCRIM No. 220 as well as the pattern instruction on the duties of the jury (CALCRIM No. 200), which instructed the jury to only consider the final written version of the instructions in their deliberations, to follow the law as explained by the trial court in those instructions, and that it was up to the jury to decide what the facts are and what happened based solely on the evidence presented at trial.

2. *Applicable Legal Principles*

"Under the due process clauses of the Fifth and Fourteenth Amendments, the prosecution must prove a defendant's guilt of a criminal offense beyond a reasonable doubt, and a trial court must so inform the jury."  (*People v. Aranda* (2012) 55 Cal.4th 342, 356 (*Aranda*).)  "An instruction that effectively lowers the prosecution's burden of proving guilt beyond a reasonable doubt is structural error because it 'vitiates *all* the jury's findings' and its effect on the verdict is 'necessarily unquantifiable and

14

indeterminate.' " (*Id.* at p. 365.) But, not every instructional error defining reasonable doubt is structural, most are subject to harmless error review. (*Id.* at pp. 365-366.) To determine whether the error is structural, "we ask whether the error rendered the *trial* 'fundamentally unfair or an unreliable vehicle for determining guilt or innocence' [citation], or whether the effect of the error is 'necessarily unquantifiable and indeterminate' [citation]." (*Id.* at p. 366.) That is, we assess " 'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on' insufficient proof." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 840 (*Daveggio*).) The court's definition of reasonable doubt during jury selection " 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

Proof beyond a reasonable doubt requires "a subjective state of near certitude" about the accused's guilt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 315.) California law defines reasonable doubt as follows: " 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' " (§ 1096.)

A trial court is not required to instruct the jury using the language of section 1096 or even reference a subjective state of near certitude. (§ 1096a; *People v. Freeman* (1994) 8 Cal.4th 450, 503.) Although the "beyond a reasonable doubt standard is a requirement of due process, . . . the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. [Citation.] Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, [citation], the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. [Citation.] Rather, 'taken as a whole, the instructions [must] correctly conve[y]

the concept of reasonable doubt to the jury.' " (*Victor v. Nebraska* (1994) 511 U.S. 1, 5; see also *Daveggio, supra* 4 Cal.5th at pp. 839-840.)

CALCRIM No. 220 defines proof beyond a reasonable doubt as "proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." In *People v. Zepeda* (2008) 167 Cal.App.4th 25, a panel of this court explained that "[t]he modifier 'abiding' informs the juror his conviction of guilt must be more than a strong and convincing belief. Use of the term 'abiding' tells the juror his conviction must be of a 'lasting, permanent nature,' it informs him 'as to how strongly and *deeply* his conviction must be *held*.' " (*Id*. at pp. 30-31 [finding the "phrase, 'proof that leaves *you* with an abiding conviction that the charge is true,' unmistakably conveys the conviction's subjective nature and the very high level of certainty required"].)

"The United States Supreme Court and the California Supreme Court, respectively, have described 'an abiding conviction' as one that is 'settled and fixed' [citation] and one that is 'lasting [and] permanent' [citation]." (*People v. Pierce* (2009) 172 Cal.App.4th 567, 573; see also *People v. Light* (1996) 44 Cal.App.4th 879, 885 [" 'abiding conviction' " adequately conveys "the requirement that the jurors' belief in the truth of the charge must be both long lasting and deeply felt"].)

3. *Analysis*

Defendant contends the trial court's unscripted oral explanation of the reasonable doubt standard during jury selection constituted structural error because it had the effect of lowering the prosecution's burden of proof. But nothing in the record suggests that the court's remarks during jury selection were intended to be a substitute for full instructions at the end of trial. (See *People v. Avila* (2009) 46 Cal.4th 680, 716.) Indeed, the court specifically told the prospective jurors that it would instruct the jury on the applicable law after all the evidence was presented, and that it would be up to the members of the jury to determine whether the prosecution had met its burden of proof beyond a reasonable

16

doubt.  Moreover, the court properly instructed the jury on the presumption of innocence and the reasonable doubt standard before closing arguments, which occurred nearly three weeks after the challenged remarks were made during jury selection.  In closing argument, the prosecutor did not repeat or rely on the court's remarks made during jury selection.  Further, both the prosecutor and defense counsel reminded the jurors that they would have a written copy of the final jury instructions for their reference during deliberations, and defense counsel urged the jurors to consult the instruction on reasonable doubt.  Defense counsel stated:  "[T]he Court instructed you on reasonable doubt. . . .  [R]ead the entire thing, but the third paragraph says:  Proof beyond a reasonable doubt is proof that leaves you with and abiding conviction that the charge is true.  [¶]  It's something that you have to say, I think that's been proven.  It's an abiding conviction.  I think I'm not going to change my mind in 20 minutes.  I'm not going to change my mind if I came back tomorrow.  It's something that I will always think this had been proven beyond a reasonable doubt."  In rebuttal argument, the prosecutor concluded his remarks by stating:  "Proof beyond a reasonable doubt is proof that leaves [you] with an abiding conviction that the charge is true, and that's absolutely right.  [Defense counsel] highlighted that portion of the law for you, but he left out the very next line:  The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.  [¶]  When you look at all the evidence in this case, there is no reasonable doubt in your mind that [defendant] wanted to kill [the victim], intended to kill her."  Prior to deliberations, the jurors were provided a written copy of the final instructions, including pattern instruction CALCRIM Nos. 220 and 200, respectively defining reasonable doubt and directing the jurors to follow the law as explained in the written instructions.

Thus the trial court properly instructed the jury with final written instructions before deliberations, which mitigated any potential problems created by the court's remarks during jury selection.  (*People v. Claxton* (1982) 129 Cal.App.3d 638, 668-669

17

disapproved on another ground by *People v. Fuentes* (1998) 61 Cal.App.4th 956, 969, fn. 12.) The jury received a copy of those instructions in writing, and the challenged remarks were made nearly three weeks earlier, also in mitigation of any potential harm. (See *People v. Elguera* (1992) 8 Cal.App.4th 1214, 1223 [noting that jurors were unlikely to remember the exact definition of reasonable doubt read to them five and one-half hours earlier].) When oral instructions conflict with written instructions, we assume the jury followed the written instructions, particularly when, as here, the jury was instructed that the written instructions are controlling. (*People v. Grimes* (2016) 1 Cal.5th 698, 729.)

Specifically, defendant argues the trial court erred in defining the phrase "abiding conviction" by informing prospective jurors during jury selection that an "abiding conviction" is a "firm belief" that is "not temporary" or "transitory." He argues that a "firm belief" does not describe the same level of confidence as proof beyond a reasonable doubt, since it does not convey the intensity of belief required for proof beyond a reasonable doubt. He relies on an opinion issued by our Supreme Court disapproving a jury instruction that required only " 'that degree of proof which produces conviction' " rather than " 'abiding conviction.' " (*People v. Brigham* (1979) 25 Cal.3d 283, 290, 292.) In that case, our high court explained: "The lasting, permanent nature of the conviction connoted by 'abiding' is missing and the juror is not informed as to how strongly and how deeply his conviction must be held. Thus, [the instruction permitted] a juror to conclude that he or she could return a guilty verdict based on a strong and convincing belief which is something short of having been 'reasonably persuaded to a near certainty.' " (*Id.* at pp. 290-291.)

This case is distinguishable from *Brigham*. Here, the trial court did not omit a key word, but merely discussed the words of the instruction and attempted to elaborate on them in a manner that was not misleading, as we next describe. "Abiding" means "[l]asting for a long time; enduring." (American Heritage Dict. (5th ed. 2016) p. 3, col. 2; see also Merriam-Webster Collegiate Dict. (11th ed. 2006) p. 2, col. 2 ["enduring,

18

continuing"]. A "conviction" is "[a] fixed or strong belief." (American Heritage Dict. (5th ed. 2016) p. 402, col. 1; see also Merriam-Webster Collegiate Dict. (11th ed. 2006) p. 274, col. 1 ["a strong persuasion or belief"].) "Firm" means "[n]ot subject to change; fixed and definite." (American Heritage Dict. (5th ed. 2016) p. 662, col. 2; see also Merriam-Webster Collegiate Dict. (11th ed. 2006) p. 471, col. 2 ["not subject to change or revision"].) A "belief" is a "[m]ental acceptance of and conviction in the truth, actuality, or validity of something," or "[s]omething believed or accepted as true." (American Heritage Dict. (5th ed. 2016) p. 164, col. 2; see also Merriam-Webster Collegiate Dict. (11th ed. 2006) p. 111, col. 2 ["something believed"; a "conviction of the truth of some statement or the reality of some being or phenomenon"].)

Thus, the trial court's explanation was not wrong. Although unnecessary, the court's elaboration correctly described that an "abiding conviction" of the truth of the charge is a fixed and definite belief that is lasting and permanent in that it would not be subject to change. (See *People v. Pierce*, *supra*, 172 Cal.App.4th at pp. 573-574 & fn. 1; *People v. Cowan* (2017) 8 Cal.App.5th 1152, 1162.)

Defendant also contends that reversal is required because the trial court improperly compared the jurors' task in deciding whether defendant was guilty beyond a reasonable doubt to making everyday decisions in their lives. In support of this argument, defendant primarily relies on *People v. Johnson* (2004) 119 Cal.App.4th 976. In that case, the trial court told prospective jurors during jury selection that they could find the defendant guilty even if they had " 'some doubt' " about his guilt, "and characterized a juror who renders a guilty verdict with 'no doubt' as 'brain dead.' " (*Id*. at p. 980.) The court also "equated proof beyond a reasonable doubt to everyday decision-making in a juror's life," such as starting a family or going to college. (*Ibid*..) The court then purported to explain the "power of reason" and added: "So that's . . . not a definition of reasonable doubt, but that's what we want you to bring to court with you, the same thing you use every day in making your decision[s]. . . .' " (*Id*. at p. 982.) The

19

court added that determining whether the defendant was guilty was "the kind of thing, the secular things, that you decide every day in your life.' " (*Id*. at p. 983.) "[T]he court instructed that jurors who find an accused person guilty or not guilty engage in the same decisionmaking process they 'use every day. When you get out of bed, you make those same decisions.' " (*Ibid*.) In closing argument, the prosecutor emphasized the court's statements by arguing that the reasonable doubt standard applied to everyday decisions and repeated the "brain dead" language used by the trial court. (*Ibid*.) The appellate court concluded that the trial court's remarks to the jury "lowered the prosecution's burden of proof below the due process requirement of proof beyond a reasonable doubt." (*Id*. at p. 985.)

Defendant's reliance on *Johnson* is misplaced, as the circumstances of this case are distinguishable. Here, considered in the context of its remarks in their entirety, the trial court did not equate the reasonable doubt standard to a lesser standard merely by referencing everyday decisions. Nor did the court tell prospective jurors that they could find defendant guilty even if they had "some doubt" about his guilt or characterize a juror who renders a guilty verdict with no doubt as "brain dead." And the prosecutor did not capitalize on the remarks to argue a lower standard. Rather, as we have discussed *ante*, here the court correctly explained the concept of proof beyond a reasonable doubt to prospective jurors during jury selection.

Shortly thereafter, the trial court asked the prospective jurors about any reluctance to "judge." After one juror expressed concern, the court explained that the jury does not judge the defendant; rather, the jury decides whether the prosecution has met its burden to show defendant's guilt beyond a reasonable doubt based on the evidence presented. It was in that context that the court made its comments about jurors "not doing anything different than things that we all do every day. . . . [Y]ou're deciding, determining whether or not how much of what we're being told we're willing to trust as being true and accurate." The court then immediately referenced the "beyond a reasonable doubt"

20

standard as a difference between a criminal trial and everyday life but emphasized that credibility determinations were "the same exercise, same function" and concluded: "So you're not judging the defendant, you're deciding whether or not you are convinced by the evidence and whether or not the standard of beyond a reasonable doubt has been met."

On this record, we see no error. While the trial court's remarks were not necessary and may have briefly muddled the applicable standard, we cannot conclude that, taken as a whole, the court's remarks and instructions did not correctly convey the concept of beyond a reasonable doubt to the jury. During jury selection and after the close of evidence, the court correctly instructed the jury on the presumption of innocence, told the jury that it was responsible for determining whether the prosecution had met its burden to show defendant's guilt beyond a reasonable doubt, and provided the jury with the correct definition of proof beyond a reasonable doubt. The court's instructions made clear that the jury's determination of reasonable doubt is to be made only after consideration of the evidence presented, and that defendant could not be found guilty if a reasonable doubt existed as to his guilt. The court's remarks during jury selection about everyday life decisions included an explanation that reaching a verdict in a criminal case *was different* from making daily decisions in that the law requires proof beyond a reasonable doubt to support a guilty verdict in a criminal case based on the evidence presented at trial.

We conclude there is no reasonable likelihood the jury applied the challenged remarks made by the trial court in an unconstitutional manner.  Accordingly, there is no basis for reversal.  (See *Victor v. Nebraska, supra*, 511 U.S. at p. 6; *Daveggio, supra,* 4 Cal.5th at pp. 842, 844 [no reasonable likelihood that the jury understood the challenged instructions to allow conviction based on insufficient proof where proper instructions were repeatedly provided during trial and the trial court's description of the reasonable doubt standard, made before jury selection, did not render the jury unable to follow the later correct instructions].)

Lastly, we find no merit in defendant's contention that the trial court erred by advising prospective jurors that they would not be judging the defendant.  As we have described *ante*, during jury selection, the court made clear that the jury's role was not to judge defendant in the sense of determining the appropriate punishment if he was found guilty of a crime; rather, the jury's role was to determine whether defendant was guilty of a crime beyond a reasonable doubt based on the evidence presented at trial.  At no point did the court suggest that the jury's duties did not include sitting in judgment of defendant in the sense of rendering a verdict as to his guilt or otherwise reduce the gravity of the jurors' role.  Nor did the court misstate the law.  Where, as here, a criminal case does not involve the death penalty, the trier of fact is not to be concerned with the question of punishment in arriving at a verdict.  (*People v. Engelman* (2002) 28 Cal.4th 436, 442; *People v. Nichols* (1997) 54 Cal.App.4th 21, 24.)  Moreover, the record reflects that the court properly instructed the jury after the close of evidence on the presumption of innocence, the reasonable doubt standard, the jury's duties, including the duty to decide defendant's guilt based on the evidence presented at trial, and that a verdict must be reached without any consideration of punishment.  (CALCRIM Nos. 200, 220, 3550.)

C. *Presumption of Sanity During Guilt Phase*

Defendant next contends the trial court erred in orally instructing the jury to presume he was sane for purposes of the guilt phase of the trial. He argues the remarks lowered the prosecution's burden of proving the mental state elements of first degree murder in violation of his due process rights. He further contends the instruction violated state law. The People concede error, but argue that defendant's claim has been forfeited and, in any event, the error did not violate defendant's due process rights and was harmless under state law. We agree with the parties that the trial court erred but find no basis for reversal. Because we reject defendant's claim on the merits, we do not reach the People's forfeiture argument.

1. *Additional Background*

During jury selection, the trial court informed prospective jurors that defendant was charged with murder, pleaded not guilty, and raised an insanity defense. The court then explained that there might be two phases of the trial: the guilt phase and the sanity phase, and that there would only be a sanity phase if the jury found defendant guilty of a crime in the guilt phase. The prospective jurors were further told that, in the sanity phase, the defendant would have to show he was legally insane at the time of the charged offense.

Shortly thereafter, the trial court explained the insanity defense as follows: "[U]nder the law, if somebody is shown to have been suffering from a mental disorder, a mental illness at the time that an alleged crime was committed, the law says that person may not be legally responsible for that crime. And that's where this insanity defense comes in. [¶] [J]ust to give you a preview, the law basically says . . . that if somebody had a mental disease when the crime was committed, and because of that defect or disease the person was incapable . . . of understanding or knowing the nature and quality of his or her act or was incapable of knowing or understanding his or her act was morally and legally wrong, then that person might meet the definition of being insane and they

23

may not be legally responsible for whatever act they committed. [¶] That's a jury question. That will be phase two."

At the guilt phase of the trial, Dr. Roof testified as a defense witness about defendant's mental health and the effects of methamphetamine use, as detailed *ante*. Immediately after Dr. Roof testified and before the defense called its final witness, the trial court told the jury in another unscripted comment:

"[L]adies and gentlemen, let me throw something in here for a minute. I know that when we were picking the jury, we talked to you about the two phases, the guilt phase, the sanity phase of this case.

"You've been hearing a lot of testimony about the defendant's mental health and all that. And I just want to make clear, just in case some of you are wondering, 'Well, gee, why are we getting into his mental state at this stage? I thought we were going to get to that in the next phase.' People may be wondering why.

"Well, here's the thing. He's being charged with first degree premeditated murder. The district attorney has to . . . convince you that he intentionally did whatever it is he did. Not only that, [the district attorney has] to convince you that he did it with premeditation. So his mental state, his mental health and all of that is relevant to that consideration.

"So that is why you've been hearing in this phase evidence of his mental health, his diagnoses, and how it affects his brain, et cetera, et cetera. Because it is relevant to the argument, to the People's claim, that he's guilty of first degree murder, he intentionally did it, with specific intent to kill, and that he premeditated. So his mental health is relevant to that. All right?

"So it's a little bit different than . . . , if we get there, . . . the next phase. But his mental health is relevant to that particular question. [¶] . . . [¶] In case you were wondering why we were getting into that. All right?"

Following an unreported sidebar requested by the prosecutor, the trial court stated in relevant part:

"Ladies and gentlemen -- just to add one more little footnote to what I said a moment ago.  So at this stage of the trial, [defendant's] sanity is not an issue at this phase.  But you have to kind of like -- *you have to presume that he is sane at this stage*.  All right?

"But it's not an issue.  Okay.  But I just wanted to explain all that to you in case some of you were wondering, 'Why are we getting into all this?'  You know.  Well, it goes to what I just talked about."  (Italics added.)

Defendant did not object or note any objection on the record to these remarks.

The trial court made no further mention of any presumption of sanity at the guilt phase of trial and neither counsel referenced any such presumption in closing argument.  The court did not give the jury a written instruction on any such presumption at the guilt phase of trial.

### 2.  *Applicable Legal Principles*

"It is fundamental to our system of jurisprudence that a person cannot be convicted for acts performed while insane."  (*People v. Kelly* (1973) 10 Cal.3d 565, 574.)  A defendant may claim legal insanity as an affirmative defense to a criminal charge.  (*People v. Hernandez* (2000) 22 Cal.4th 512, 522; § 25, subd. (b).)  Legal insanity is established if the defendant was incapable of knowing or understanding the nature and quality of the criminal act, or of distinguishing right from wrong at the time of the commission of the offense.  (*People v. Mills* (2012) 55 Cal.4th 663, 671 (*Mills*); § 25, subd. (b).)  " '[T]he issue at the insanity trial is not whether in fact the defendant has committed the act but whether or not he should be punished.' "  (*Hernandez*, at p. 522.)

Section 1026, subdivision (a) provides for a bifurcated trial on the issue of insanity, and a conclusive presumption of sanity at the initial guilt phase. (See also *Mills, supra,* 55 Cal.4th at p. 670.) "The defendant is presumed sane for *procedural* purposes, not for any evidentiary purpose." (*Id.* at p. 681.)

"At a trial on the issue of guilt, '[e]vidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.'[4] [Citations.] Thus, while the evidence of a defendant's mental state at the guilt and sanity phases 'may be overlapping' [citation], the defendant's sanity is *irrelevant* at the guilt phase and evidence tending to prove insanity, as opposed to the absence of a particular mental element of the offense, is *inadmissible* [citations].

"Notably, a defendant may suffer from a diagnosable mental illness without being legally insane under the . . . standard [for insanity]. [Citations.] A defendant who elects to plead both not guilty and not guilty by reason of insanity may have the opportunity to employ mental state evidence in two different ways. At the guilt phase, the People must prove all elements of the charged offense, including mens rea. The defense may not claim insanity. It may, however, produce lay or expert testimony to rebut the prosecution's showing of the required mental state. If found guilty, at the next phase of trial the defendant bears the burden of proving, by a preponderance of the evidence, that

---

**4** Mental disorder evidence is relevant to the defense theory known as " 'diminished actuality.' " (*People v. Elmore* (2014) 59 Cal.4th 121, 139.) At the guilt phase of trial, defendants are allowed "to introduce evidence of mental disorder to show they did not actually form a mental state required for guilt of a charged crime. But the scope of the diminished actuality defense is necessarily limited by the presumption of sanity, which operates at a trial on the question of guilt to bar the defendant from claiming he is not guilty *because he is legally insane*." (*Id.* at p. 141.)

26

he was legally insane when he committed the crime." (*Mills, supra,* 55 Cal.4th at pp. 671-672, fn. omitted.)

"[T]he jury should not be instructed on the presumption of sanity at the guilt phase, because the question of legal sanity is then irrelevant. [Citation.] 'The Legislature's intent in providing for bifurcation when a defendant pleads both not guilty and not guilty by reason of insanity was to *simplify* the issues before the jury, by "remov[ing] entirely from the first stage of the trial any issue as to legal sanity." [Citation.]' [Citation.] Therefore, it is improper for the jury to weigh the presumption of sanity during deliberations on the question of guilt." (*People v. Elmore, supra*, 59 Cal.4th at p. 141; see also *Mills, supra*, 55 Cal.4th at pp. 667, 680-681 [since the question of a defendant's sanity is entirely irrelevant at the guilt phase of a bifurcated trial, no instruction on the subject should be given, as it only complicates matters at the guilt phase by injecting the subject of sanity before it is at issue].)

" 'In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement.' " (*Mills, supra*, 55 Cal.4th at p. 677.) In determining whether an instruction rises to the level of a due process violation, " 'the question is whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." [Citations.]' " (*Ibid.* [the question is whether the deficient instruction " ' " 'so infected the entire trial that the resulting conviction violates due process' " ' "].)

An instruction on the presumption of sanity that does not rise to the level of a due process violation may nonetheless require reversal on state law grounds. (*Mills, supra*, 55 Cal.4th at p. 681.) We review such an error under the reasonable probability standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Mills*, at p. 681.) The question is whether it is reasonably probably that defendant would have obtained a more favorable result absent the error. (*Ibid.*)

27

### 3. *Analysis*

We conclude the trial court's instructional error on the presumption of sanity did not violate defendant's due process rights and was harmless error under state law. In reaching these conclusions, we find *Mills* instructive.

In *Mills*, the defendant shot and killed a man at an Amtrak station. (*Mills*, *supra*, 55 Cal.4th at p. 667.) He was charged with murder, pleaded not guilty, and raised an insanity defense. (*Id*. at p. 666.) At the guilt phase of trial, there was evidence presented showing that the defendant suffered from a delusional disorder in the paranoid spectrum but that his paranoia was not entirely delusional in that his delusions were not "utterly beyond the realm of possibility," that is, "[t]hey concerned events that might actually happen." (*Id*. at p. 668.) There was also evidence that, on the date of the killing, the defendant believed he was being followed by people, he heard someone say something to him as he approached the Amtrak station, which he interpreted to mean he was going to be shot, and was observed talking to himself at the station, including saying, "You got a gun?" numerous times. (*Id*. at p. 667.) Eyewitness testimony showed that the defendant confronted the victim and demanded to know whether the victim had a gun and wanted to kill him. (*Id*. at p. 667.) Thereafter, the defendant pulled out a gun and shot the victim multiple times. (*Ibid*.) The defendant testified on his own behalf. (*Ibid*.) He claimed that he shot the victim after the victim became angry, threatened to kill him, made a hand gesture indicating he had a gun, and then put his hand into his pocket (which defendant thought was an attempt to pull a gun). (*Id*. at p. 668.)

The defense theory in *Mills* was unreasonable or "imperfect" self-defense. (*Mills*, *supra*, 55 Cal.4th at p. 668.) Defense counsel argued that the defendant was guilty only of manslaughter, because he actually but unreasonably believed the victim posed an imminent threat when he shot him. (*Id*. at pp. 668-669.) However, counsel also argued that the defendant's fear was not purely delusional; his fears were based on actual facts and experiences that he misinterpreted due to his paranoia. (*Id*. at p. 669.)

28

At the guilt phase of trial, the trial court instructed the jury, at the prosecutor's request and over defense counsel's objection, that " '[f]or the purpose of reaching a verdict in the guilt phase of this trial, you are to conclusively presume that the defendant was legally sane at the time the offenses [are] alleged to have occurred' " (*Mills*, *supra*, 55 Cal.4th at p. 678, fn. 10.) The jury was instructed on mental illness and hallucinations and their effect on the defendant's actual formation of the intent required for murder. The jurors were also told that they, not the defense expert, must decide whether the defendant acted with the required mental state and that hallucination could be considered as a contributing cause of the homicide, but that the defendant's belief in the necessity of self-defense could not be based on delusion alone. (*Id*. at pp. 677, 678, fn. 10.)

The *Mills* court concluded that the trial court erred in instructing the jury on the conclusive presumption of sanity at the guilt phase, but found that the error did not violate the defendant's due process rights, since there was no reasonable likelihood the jury would have applied the presumption of sanity to reduce the prosecutor's burden of proof, given the facts, the way the case was tried, and the instructions as a whole. (*Mills*, *supra*, 55 Cal.4th at pp. 676-680.) Our high court explained that the instructions on mental illness, hallucinations, and the jury's duty to decide whether defendant acted with the requisite mental state "would [not] have made sense if the jury understood that defendant was conclusively presumed to be free of mental disease or disorder," and that "when considering the instructions on mental state and mental disease evidence, the jury would not have tended to believe that the presumption of sanity barred it from considering the evidence of defendant's mental illness and its impact on his claim of unreasonable self-defense." (*Id*. at pp. 678-679.) The court further explained that defense counsel strongly urged the jury to consider the mental health evidence (which was the centerpiece of the defense) in determining whether the defendant acted in unreasonable self-defense, and the prosecutor only mentioned the presumption of sanity once during closing argument and did not use the presumption to attack defendant's

29

evidence of his mental condition or his theory of unreasonable self-defense. (*Id*. at p. 679.) Rather, the prosecutor challenged the reliability of the defense expert's testimony and argued that defendant had fabricated his claim of unreasonable self-defense, placing great weight on the testimony of the eyewitnesses and the physical evidence. (*Id*. at p. 679.)

The *Mills* court further concluded that the presumption of sanity instruction violated state law but found no prejudice. (*Mills*, *supra*, 55 Cal.4th at pp. 680-681.) In so concluding, the court stated, "We have explained in connection with defendant's due process argument that the jury was not reasonably likely to have applied the presumption of sanity to foreclose consideration of his mental state evidence. That analysis applies equally to the question of prejudice under *Watson*. Furthermore, the evidence of defendant's guilt was strong and direct. His inherently improbable version of the shooting conflicted with the physical evidence and the testimony of many witnesses. We are satisfied that a result more favorable to the defense was not reasonably probable absent the instruction on the presumption of sanity." (*Mills*, at p. 681.)

Here, during jury selection, the trial court explained the difference between the guilt and sanity phases of the trial. In doing so, the court accurately defined legal insanity pursuant to CALCRIM No. 3450 and advised the prospective jurors that the question of defendant's sanity was an issue to be decided in the second phase of the trial if defendant was found guilty of committing a crime in the first phase of the trial. As we have described *ante*, during the trial and in connection with trying to explain to the jury why it had heard expert testimony on defendant's state of mind, the court orally instructed the jury to presume defendant sane during the initial phase of trial. Although we agree with the parties that this was error, we conclude after examining *Mills* that defendant has similarly failed to establish deprivation of due process. Considering this case in its entirety, we are confident the jury did not apply the presumption of sanity in a way that unconstitutionally affected the burden of proof as to defendant's mental state.

30

At the same time as the trial court improperly told the jurors to presume sanity, it told them that defendant's mental health *was indeed relevant* to the People's claim that he was guilty of first degree murder; specifically, as to whether he had the specific intent to kill and whether the killing was premeditated. In the final jury instructions, the jury was instructed, both orally and in writing, that evidence of mental impairment was relevant to whether defendant acted with specific intent to kill and whether he acted with deliberation and premeditation, that evidence of a hallucination was relevant to whether defendant acted with deliberation and premeditation, and that it was up to the jury to decide whether defendant acted with the required mental state for first degree murder.

During closing argument, defense counsel conceded that defendant killed the victim, but argued defendant was only guilty of voluntary manslaughter based on heat of passion arising from provocation. In doing so, counsel repeatedly emphasized that defendant did not possess the requisite mental state to be convicted of murder due to his mental illness and drug use. The centerpiece of the defense was that defendant's mental state at the time of the killing precluded a finding of murder. The defense theory was that defendant was only guilty of voluntary manslaughter because the killing occurred after he flew into a "fit of rage" during "a very traumatic confrontation about the future of his marriage." In making this argument, counsel noted that defendant heard voices during the struggle with the victim, including one that told him to "get her." Counsel insisted that the circumstances of the killing, including the depth of the stab wounds, defendant's mental condition, and drug use, showed that he did not plan to kill the victim (i.e., there was no premeditation). The prosecutor, for his part, focused on the eyewitness testimony (including defendant's testimony), the physical evidence, and defendant's conduct and statements following the killing, contending that the defense theory of voluntary manslaughter had no merit. At one point, the prosecutor specifically acknowledged that evidence of defendant's mental illness could be considered by the jury in determining

31

whether he was guilty of first degree murder, and at no point did he argue the jury could not consider that evidence.

Viewing the record as a whole, we conclude there is no reasonable likelihood the jury took the trial court's passing reference to an erroneous presumption and applied it to reduce the prosecution's burden of proof on the mental state elements necessary for first degree murder. Therefore, defendant's due process rights were not violated.[5] We further conclude that defendant suffered no prejudice under state law. Applying the *Watson* standard, we are satisfied that it is not reasonably probable that defendant would have obtained a more favorable result absent the instructional error. We reach this conclusion based on our due process analysis and the evidence of defendant's guilt, including his testimony and his conduct and statements following the killing.

D. *CALCRIM No. 627 and CALCRIM No. 3428*

Defendant also contends the trial court prejudicially erred in instructing the jury with CALCRIM Nos. 627 and 3428.

Before closing argument, and in conjunction with its other final instructions (including instructions on murder and voluntary manslaughter), the trial court orally instructed the jury pursuant to the pattern instruction on mental impairment as a defense to specific intent or mental state (CALCRIM No. 3428) and the pattern instruction on the effect of hallucinations on premeditation and deliberation (CALCRIM No. 627). Prior to deliberations, the jury was provided a packet of final written instructions, including the two at issue here.

---

[5] We are not persuaded that the federal cases relied on by defendant, *Patterson v. Gomez* (9th Cir. 2000) 223 F.3d 959 and *Stark v. Hickman* (9th Cir. 2006) 455 F.3d 1070, support a contrary conclusion. We find these cases distinguishable for the reasons stated in *Mills* and the Attorney General's briefing.

32

As for CALCRIM No. 627, the jury was provided with a written instruction as follows:

"A hallucination is a perception not based on objective reality. In other words, a person has a hallucination when that person believes that he or she is seeing or hearing something that is not actually present or happening.

"You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted with deliberation and premeditation. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

As to CALCRIM No. 3428, the jury was provided with a written instruction as follows:

"You have heard evidence that the defendant may have suffered from a mental disease. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime.

"In connection with the charge of first or second degree murder, the People have the burden of proving beyond a reasonable doubt that the defendant acted with malice aforethought. You may consider evidence of mental impairment only as to whether the defendant acted with express malice--whether he had the specific intent to kill.

"In connection with the charge of first degree murder, the People have the burden of proving beyond a reasonable doubt that the defendant acted with premeditation and deliberation. You may consider evidence of mental impairment only as to whether the defendant acted with premeditation and deliberation. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

Defendant argues CALCRIM No. 627 was given in error because the evidence did not support it.  He adds that this instruction, when given in conjunction with CALCRIM No. 3428, improperly implied that hallucinations are the *only* mental disease symptom that can negate premeditation and deliberation.  He asserts that CALCRIM No. 627 undermined his defense as he was not relying on hallucinations, but rather the symptom of "racing thoughts" (i.e., a form of disorganized thinking) to negate premeditation and deliberation.  We see no error or prejudice.

CALCRIM No. 627 assists a jury in determining whether the defendant acted with deliberation and premeditation when there is evidence of a hallucination to potentially negate the premeditation and deliberation elements of first degree murder and thereby reduce a first degree murder to second degree.  (*People v. Padilla* (2002) 103 Cal.App.4th 675, 677 [evidence of a hallucination admissible to negate deliberation and premeditation so as to reduce first degree murder to second degree murder] (*Padilla*).)  CALCRIM No. 627 is a pinpoint instruction to be given on request when the evidence supports the defense theory.  (*People v. McCarrick* (2016) 6 Cal.App.5th 227, 243.)

CALCRIM No. 3428 guides the jury in deciding whether a defendant had the requisite mental state; here, whether defendant had the specific intent to kill and acted with premeditation and deliberation.

First, we see no error in the trial court's instructing the jury with CALCRIM No. 627.  The instruction is a correct statement of law (see *Padilla, supra*, 103 Cal.App.4th at pp. 677, 679) and was supported by the evidence.[6]  The evidence adduced at trial, if believed by the jury, would have permitted the conclusion that defendant was experiencing hallucinations when he attacked the victim.  There was evidence that defendant had been diagnosed with schizoaffective disorder and his symptoms included

---

[6] The record does not reflect whether the CALCRIM No. 627 instruction was requested by the defense.  The defense did not object to the instruction in the trial court.

34

auditory hallucinations. There was also evidence that methamphetamine use can cause psychotic symptoms, including hallucinations and delusions, and that defendant had used methamphetamine shortly before he attacked the victim. Defendant testified that he heard a voice tell him to "[g]et her" as he was struggling with the victim, and that he listened to the voices he was hearing and did what they told him to do and stabbed her in the neck. The law is clear that a party may not complain on appeal that a jury instruction otherwise correct in the law and supported by the evidence was too general or incomplete unless the party requested in the trial court a modification to or clarification of the challenged instruction. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570; *People v. Livingston* (2012) 53 Cal.4th 1145, 1165.)

Further, defendant's contention that CALCRIM No. 627 improperly implied that hallucinations were the only mental disease symptom that could negate premeditation and deliberation is unsupported; nothing in the instruction states or suggests as much. And, given the direction of CALCRIM No. 3248 as well as the trial court's specific advisement that defendant's mental health was relevant to the issues of specific intent to kill and premeditation, considered with both counsel's arguments to the jury, there is no reasonable possibility the jury interpreted CALCRIM No. 627 to preclude it from considering symptoms of defendant's mental impairment other than hallucinations in determining whether the prosecution had shown premeditation and deliberation.[7] (*People v. Houston* (2012) 54 Cal.4th 1186, 1229 ["When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as

---

[7] In closing argument, the prosecutor did not argue or imply that evidence of a hallucination was the only mental impairment evidence that could negate premeditation and deliberation. The prosecutor specifically acknowledged that evidence of defendant's mental impairment, including hallucinations, could be used to reduce first degree murder to second degree murder. Defense counsel, for his part, urged the jury to consider various aspects of defendant's mental condition to reject a finding of premeditated murder, including auditory hallucinations, disorganized thoughts, and "racing thoughts."

a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner"].)

Although defendant adds that CALCRIM No. 627 was not responsive to the evidence and was improperly given because there was no evidence that, as a result of a hallucination, he was *provoked* to kill the victim, we disagree. In support of his position, defendant relies on *Padilla, supra,* 103 Cal.App.4th 675, but nothing in that case limits the use of CALCRIM No. 627 to cases in which a hallucination provokes a killing under a heat of passion theory based on provocation. (*Padilla*, at pp. 677-679.) Rather, the case stands for the general proposition that a hallucination may negate the elements of premeditation and deliberation so as to reduce first degree murder to second degree murder, but a hallucination cannot negate malice so as to mitigate murder to voluntary manslaughter. (*Id.* at p. 677.)

E. *Involuntary Manslaughter*

Defendant also contends the trial court prejudicially erred by failing to instruct the jury on involuntary manslaughter as a lesser included offense to murder.

1. *Applicable Legal Principles*

The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater charged offense. (*People v. Smith* (2013) 57 Cal.4th 232, 239; *People v. Rogers* (2006) 39 Cal.4th 826, 866 (*Rogers*).)

On appeal, we independently review whether the trial court erred in failing to instruct on a lesser included offense. (*People v. Booker* (2011) 51 Cal.4th 141, 181.) In making this determination, we view the evidence in the light most favorable to the defense. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) " '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty

36

only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed.' " (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Such malice may be express or implied." (§ 188, subd. (a).) Express malice is the intent to kill (*People v. Smith* (2005) 37 Cal.4th 733, 739), whereas implied malice exists where the defendant "acted with conscious disregard that the natural and probable consequences of [his] act or actions were dangerous to human life." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197; see *People v. Knoller* (2007) 41 Cal.4th 139, 143 ["implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less"].) Implied malice has " 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' " (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

Involuntary manslaughter is a lesser included offense of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) It is the unlawful killing of a human being without malice (§ 192, subd. (b)), that is, a killing done without the intent to do so and without conscious disregard for life. As relevant here, an unlawful killing may constitute involuntary manslaughter when a defendant without malice kills the victim during the commission of an inherently dangerous assaultive felony. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 33-34; see *People v. Bryant* (2013) 56 Cal.4th 959, 970 [an unlawful killing "without malice in the commission of an inherently dangerous assaultive felony . . . cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life"].) An unlawful killing may also constitute

involuntary manslaughter when substantial evidence demonstrates that, because of mental illness, the defendant did not have the mental state of malice. (*Rogers, supra*, 39 Cal.4th at p. 884; *People v. McGehee* (2016) 246 Cal.App.4th 1190, 1208.)

### 2. *Analysis*

Defendant argues there was sufficient evidence to support an involuntary manslaughter instruction based on the theory that defendant killed the victim without malice during the commission of an inherently dangerous assaultive felony. We disagree. On this record, a reasonable jury could not have concluded that defendant was guilty of involuntary manslaughter *but not* the greater offense of murder. A rational jury simply could not have entertained a reasonable doubt as to whether defendant acted with conscious disregard of the risk his conduct posed to the victim's life.

As detailed *ante*, the evidence adduced at trial showed that defendant violently attacked the victim after he became enraged when she smirked and refused to tell him whether she was leaving him. He stabbed her twice in the neck with a box cutter and severely cut her thumb when she blocked him from stabbing her a third time. There was also evidence of blunt force trauma to multiple areas of the victim's body, including her head and neck. The fact that defendant targeted the victim's neck increased the likelihood of death. Defendant deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life.

We are unpersuaded by defendant's contention that an involuntary manslaughter instruction was warranted because of his initial testimony at his retrial that he did not intend to stab or kill the victim, only intended to scare her by putting the box cutter to her neck, and believed the stab wounds were caused when he and the victim were struggling and rolling around the van. As we have detailed *ante*, he later admitted that he prevented the victim from leaving the van after he inflicted the first stab wound, ignored her request to be taken to a doctor, put the box cutter to her neck, and then stabbed her a second time to "get the job done" and "finish her off." He admitted that he was aware that putting the

38

box cutter to the victim's neck was dangerous, that she was bleeding "a lot" after the first stab wound, and that he killed her because she smirked at him. The evidence in this case demonstrates that defendant acted with a *minimum* of conscious disregard for human life. There is no substantial evidence in the record indicating that he lacked a subjective awareness of the danger his conduct posed to human life. (See *People v. Brothers, supra*, 236 Cal.App.4th at p. 35 ["when . . . the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter"].) Accordingly, the trial court did not err. (See *id.* at p. 34 [no substantial evidence of absence of malice, because even crediting defendant's testimony that she did not intend to kill the victim, her own account unequivocally established she engaged in a deliberate and deadly assault with a large wooden broom handle after she became enraged]; *People v. Cook* (2006) 39 Cal.4th 566, 596 ["[Defendant] savagely beat [the victim] to death. Because the evidence presented at trial did not raise a material issue as to whether defendant acted without malice, the trial court was not obliged, on its own initiative, to instruct the jury on involuntary manslaughter as to victim . . ."].)

We also reject defendant's contention that there was sufficient evidence to support an involuntary manslaughter instruction based on mental illness.[8] While there was evidence that defendant had been diagnosed and was being treated for symptoms related to schizoaffective disorder (including auditory hallucinations and "racing thoughts"), and that he was experiencing such symptoms at the time he was struggling with the victim, that does not change the state of the evidence as to defendant's own subjective awareness of the dangerousness of his actions as expressed by his trial testimony. For the reasons we have discussed, a reasonable jury could not have concluded that defendant was guilty only of the lesser offense of involuntary manslaughter based on mental illness, not the greater offense of first or second degree murder.[9] Further, the jury was presented with the lesser offenses of second degree murder and voluntary manslaughter and rejected them. Under these circumstances, there is no reasonable probability that, had the jury been instructed on involuntary manslaughter, it would have chosen that option. (*Rogers, supra*, 39 Cal.4th at p. 884; see also *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145 ["the fact that the jury rejected [voluntary] manslaughter and found defendant guilty of the first degree murder . . . precludes any possible error in the refusal to instruct on involuntary manslaughter"].)

II

*Ineffective Assistance of Counsel*

Defendant first contends his trial counsel rendered ineffective assistance by failing to object with respect to two claims of instructional error we have discussed *ante*.

---

[8] In connection with this argument, defendant asserts that his voluntary intoxication "provided additional support for involuntary manslaughter based on a killing without malice." However, evidence of voluntary intoxication does not negate implied malice. (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1300; § 29.4.) Thus, defendant's voluntary intoxication is not relevant to whether the trial court erred in failing to instruct the jury on involuntary manslaughter.

40

Because we have addressed the merits of those claims and have found no error or prejudice, defendant's related claims of ineffective assistance of counsel fail and do not require further discussion. (*People v. Ledesma* (2006) 39 Cal.4th 641, 748.)

His final claim of ineffective assistance is trial counsel's failure to object to what he characterizes for purposes of this claim as the prosecutor's improper argument concerning deliberation and premeditation. He argues that the prosecutor misstated the concepts of deliberation and premeditation in closing argument by equating a " 'cold, calculated decision to kill' " with a hypothetical motorist's decision whether to stop for a yellow light. According to defendant, this analogy was inapt because it provided the jury with a quintessential example of a hurried and hastily executed decision that was exactly the opposite of what the jury was required to find, which had the effect of reducing or eliminating the People's burden of proving deliberation and premeditation beyond a reasonable doubt. We disagree.

A. *Additional Background*

During closing argument, the prosecutor discussed the concepts of deliberation and premeditation in arguing that defendant was guilty of first degree murder. He explained that deliberation required a showing that appellant "[c]arefully weighed the considerations for and against [killing the victim], and knowing the consequences, decided to kill." He added that premeditation required a showing that appellant "[d]ecided to kill before completing the acts that caused death," and that it was the extent of the reflection, not the length of time it took defendant to reflect, that determined whether defendant premeditated and deliberated. He argued that, "A cold, calculated

---

**9** Because we have found that the trial court did not have a duty to instruct the jury on involuntary manslaughter, we reject defendant's related contention that the CALCRIM No. 3428 instruction should have told the jurors that they could consider mental impairment evidence as negating implied malice.

decision to kill can be reached quickly"; "the test is not the length of time, [but rather] the extent of reflection." Then he applied an analogy to illustrate that premeditation and deliberation can occur quickly:

"Think about a yellow traffic light. Because the law, remember, tells you that that cold, calculated decision to kill can be made quickly. When you are approaching the yellow traffic light, you are considering so many things at once, so many potential repercussions and dismissing those and deciding whether to proceed forward, to hit the accelerator or hit the brake.

"You're thinking about other cars, both in front of you, behind you. You're thinking about the person on the right that's going to do a right on red. You're thinking about the person on the left that may use the crosswalk. Your brain calculates all those things and then determines whether to go forward and press on or not.

"First degree murder can be that fast. It's the extent of the reflection, not the time."

Defense counsel also discussed the concepts of deliberation and premeditation in arguing that defendant was guilty of voluntary manslaughter, not first degree murder. In doing so, he explained that "[t]he defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death." Thereafter, counsel argued why the facts of this case did not show deliberation or premeditation.

Prior to and after closing arguments, the jury was instructed on first degree murder pursuant to CALCRIM No. 521, in relevant part, as follows:

"The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.

42

The defendant acted with *premeditation* if he decided to kill before completing the acts that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

The jurors were also instructed that, if the attorneys' comments on the law conflicted with the trial court's instructions, they must follow the law as explained by the trial court. (CALCRIM No. 200.)

B. *Applicable Legal Principles*

To prevail on a claim of ineffectiveness of counsel, the defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's error, the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694; *People v. Maury* (2003) 30 Cal.4th 342, 389.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*Maury*, at p. 389.)

In the context of a murder prosecution, " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold,

43

calculated judgment may be arrived at quickly. . . ." [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

C. *Analysis*

The prosecutor's argument in this case was similar to an argument examined by our Supreme Court in *People v. Avila, supra,* 46 Cal.4th 680. In that case, "the prosecutor used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' " (*Id*. at p. 715.) After making that analogy, the prosecutor "immediately said, 'Deciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same. There's great dire consequences that have a difference here.' " (*Ibid*.) The *Avila* court concluded that the prosecutor's argument was not improper since the prosecutor was not equating " 'the "cold, calculated" judgment of murder" ' " with " 'deciding whether to stop at a yellow light or proceed through the intersection.' " (*Ibid*.)

Defendant acknowledges *Avila* but contends that its holding is distinguishable because the prosecutor here did not add the "disclaimer" of telling the jury that the decision to kill and the decision to enter an intersection after a traffic light turned yellow were not actually the same. But the thrust of the prosecutor's argument in this case was similar in all material respects to the argument made in *Avila*. Both the prosecutor here and the prosecutor in *Avila* mentioned factors a driver would consider in deciding whether to proceed in the few seconds after seeing a yellow light. As in *Avila*, the yellow light analogy was used in this case to illuminate how a premeditated and deliberate decision to kill could happen quickly, but that premeditation and deliberation do not happen without at least some degree of weighing the consequences. This analogy accurately reflects the law in that a defendant can quickly make a deliberate,

premeditated decision to kill. (*People v. Solomon* (2010) 49 Cal.4th 792, 812 [" ' "Premeditation and deliberation can occur in a brief interval" ' "].) In our view, the "disclaimer" in *Avila* concerned the different consequences of a decision to kill compared to a decision to enter an intersection when there is a yellow light, and the absence of such a "disclaimer" here does not render the prosecutor's argument improper. It would have been readily apparent to jurors that the consequences of entering an intersection with a yellow light were less dire than the choice to commit murder.

But even were we to assume error and conclude that defense counsel's failure to object thereto was deficient performance, defendant has failed to show prejudice. He has not shown there is a reasonable probability that the result of the proceeding would have been more favorable to him but for counsel's failure to object. During closing argument, both the prosecutor and defense counsel properly argued the concepts of premeditation and deliberation, and the jury was correctly instructed on the concepts before and after closing arguments. The jurors were also told that, if the attorneys' comments on the law conflicted with the trial court's instructions, they must follow the law as the trial court explained it to them. " 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." [Citation.]' " (*People v. Centeno* (2014) 60 Cal.4th 659, 676.)

### III

### *Sufficiency of the Evidence*

Defendant contends reversal is required because there was insufficient evidence of premeditation and deliberation. We disagree.

A. *Standard of Review*

In reviewing a challenge to the sufficiency of the evidence, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses

substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the trier of fact's finding.]' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Where, as here, a defendant makes a motion for acquittal pursuant to section 1118.1 at the close of the prosecution's case-in-chief, " 'the sufficiency of the evidence is tested as it stood at that point.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1213.) "We review independently a trial court's ruling under section 1118.1 that the evidence is sufficient to support a conviction." (*Ibid*.)

To find a person guilty of deliberate premeditated murder, the evidence must show the defendant's acts were the result of careful thought and weighing of considerations rather than an unconsidered or rash impulse. (*People v. Manriquez* (2005) 37 Cal.4th 547, 577.) In determining whether there is sufficient evidence in a murder case to sustain findings of premeditation and deliberation, our Supreme Court has established the following guidelines for our review:

"The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which

46

the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

B. *Analysis*

We conclude sufficient evidence supports the jury's findings of premeditation and deliberation. We have discussed the evidence at length *ante*; there was evidence of motive in defendant's rage at the collapse of his marriage and loss of control. The evidence showed that defendant and the victim were not getting along, he was worried that she was cheating on him and was going to leave him, and he was losing control over her.

There was also evidence of the intentional and deliberate manner of killing: two neck stabs, with an interval to reflect in between, as well as an attempt to stab the victim a third time. The evidence showed that, after defendant inflicted the first stab wound, he prevented the victim from leaving the van, sat her down, ignored her request to be taken to a doctor, and then stabbed her throat a second time to "get the job done." He then attempted to stab her a third time, but she blocked him with her hand, resulting in a severe cut to her thumb. There was also evidence of blunt force trauma to multiple areas of the victim's body, including her head and neck. Given this evidence, a reasonable jury could have concluded that defendant's actions showed premeditation and deliberation. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1293 [even if the strangulation was spontaneous, the additional act of slashing the victim's throat was indicative of a reasoned decision to kill]; *People v. Stitely* (2005) 35 Cal.4th 514, 544 ["defendant had

47

ample opportunity to consider the deadly consequences of his actions"]; *People v. Steele* (2002) 27 Cal.4th 1230, 1250 [use of two methods of inflicting harm, stabbing and strangling, tended to support premeditation and deliberation]; see also *People v. Combs* (2004) 34 Cal.4th 821, 851 ["use of multiple methods"]; *People v. Perez* (1992) 2 Cal.4th 1117, 1127 ["The manner of killing is also indicative of premeditation and deliberation. The evidence of blood in the kitchen knife drawer supports an inference that defendant went to the kitchen in search of another knife after the steak knife broke. This action bears similarity to reloading a gun or using another gun when the first one has run out of ammunition"].)

Although there was minimal evidence of planning prior to the initiation of the attack, there was evidence from which a reasonable jury could have inferred that defendant talked the victim into the van to induce her to remain in the marriage or, failing that, to kill her. And, as the People point out, strong evidence of planning is not always required. (See, e.g., *People v. Hernandez* (1988) 47 Cal.3d 315, 349-351.)

Finally, defendant's postkilling conduct, which included driving away from the scene without assisting the victim, abandoning his van, changing his appearance to avoid detection, preparing to flee to Oklahoma, giving a false name after being arrested, and lying throughout his police interrogation to avoid culpability, showed a consciousness of guilt from which a reasonable jury could have concluded he had deliberately intended to kill the victim. (See *People v. Lasko* (2000) 23 Cal.4th 101, 112 ["defendant's actions *after* striking the fatal blow were not those of an unintentional killer: he did not call an ambulance, he tried to obscure evidence of the killing"].)[10]

---

[10] As he did in his first appeal, defendant relies on *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1118 and *People v. Boatman* (2013) 221 Cal.App.4th 1253, to argue that there was insufficient evidence of premeditation and deliberation. For the reasons we explained in our prior opinion, we find defendant's reliance on these cases misplaced. (*People v. Williams*, *supra*, 23 Cal.App.5th at pp. 410-412.) We also reject defendant's

## IV

### *Abstract of Judgment*

Defendant's total sentence consisted of an indeterminate term of 50 years to life for first degree murder (25 years to life, doubled for the strike prior (§§ 187, subd. (a), 667, subds. (a), (b)-(i), 1170.12)), plus a determinate term of six years, comprised of one year for the weapon enhancement (§ 12022, subd. (b)(1)) and five years for a prior serious felony conviction (§ 667, subd. (a)).

The abstract of judgment constitutes the commitment and is the order sending the defendant to prison, and the process and authority for carrying the judgment and sentence into effect. (§ 1213; *People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Accuracy is essential in this document, and we have the authority to correct clerical errors in it at any time. (*Mitchell*, at pp. 185-187.)

The parties agree that the trial court's use of separate abstracts of judgment for the indeterminate term (Judicial Council form CR-292) and the determinate term (Judicial Council form 290.1) was improper because defendant did not receive a determinate term for any offense; rather, he was found guilty of a single count of first degree murder, a

---

contention that application of the so-called *Toledo* doctrine supports a finding that there was insufficient evidence of premeditation and deliberation. Defendant asserts that since the prosecution presented his testimony from the first trial in its case-in-chief and did not present any additional evidence that was incompatible with his exculpatory version of events related to the killing, the People are bound by that version of events. (See *People v. Toledo* (1948) 85 Cal.App.2d 577, 580-581 [holding that when the prosecution presents, as part of its case, a statement of the defendant as to how a killing occurred, it is bound by that evidence absent proof to the contrary], superseded in part as stated in *People v. Burney* (2009) 47 Cal.4th 203, 248-249.) Assuming without deciding that the "antiquated and questionable statement of the law" for which defendant cites *Toledo* has continuing vitality (*id.* at p. 248), it is inapplicable here because the prosecution presented substantial evidence of premeditation and deliberation that was inconsistent with the exculpatory content of defendant's statements about the killing. (See *id*. at pp. 248 [the *Toledo* doctrine " 'is applicable only where there is no other competent and substantial evidence which could establish guilt"].)

49

crime punishable by an indeterminate term of imprisonment. According to the parties, the enhancements found true in connection with this offense should have been included on the indeterminate abstract of judgment because they were imposed on the indeterminate sentence. We agree. As a consequence, we conclude the trial court should not have prepared a determinate abstract of judgment.

We also agree with the parties that the indeterminate abstract of judgment should not include defendant's 25 years to life sentence for the strike prior in paragraph three, which is reserved for enhancements in the section 667 series for prior convictions and prior prison terms. The indeterminate abstract should include a check mark in paragraph eight and specify that defendant was sentenced to a total of 50 years to life on count one pursuant to sections 667, subdivisions (b)-(i) and 1170.12.

### DISPOSITION

The judgment is affirmed. The trial court is directed to prepare a corrected abstract of judgment consistent with this opinion and forward a certified copy thereof to the Department of Corrections and Rehabilitation.


/s/<br>
Duarte, J.

We concur:


/s/<br>
Murray, Acting P. J.


/s/<br>
Krause, J.

50